IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

**STATE OF TENNESSEE v. SEAN AUSTIN MILLER**

**Appeal from the Circuit Court for Marshall County
No. 2022-CR-84    M. Wyatt Burk, Judge**

_____

**No. M2024-00710-CCA-R3-CD**

_____

The Defendant, Sean Austin Miller, was convicted of aggravated sexual battery and received a sentence of ten years in confinement. The sole issue presented for our review is whether the Defendant touched the victim for the purpose of sexual arousal or gratification. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Brent Horst, Madison, Tennessee, for the appellant, Sean Austin Miller.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Robert J. Carter, District Attorney General; and Lee Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On February 14, 2022, the Defendant, a long-time friend of the seven-year-old victim's family, was captured on a nanny camera seated in a chair with his legs spread open with the victim facing forward, straddled atop him while the Defendant simultaneously groped the victim on her legs, upper thighs, and buttocks and intermittently rocked the victim back and forth and up and down. Father observed the behavior on the video, rushed home, and found the victim standing in front of the Defendant in between his legs with a blanket wrapped around them. When the Defendant removed the blanket, he was naked from the waist down. The Defendant told Father, "I'm sorry. I molested her." Father called the police. Based on these events, the Defendant was indicted by a Marshall County

Grand Jury on August 17, 2022, for aggravated sexual battery in violation of Tennessee Code Annotated section 39-13-504.

The proof at the Defendant's May 30, 2023 trial established that on February 14, 2022, Detective Santiago McKlean of the Lewisburg Police Department responded to the victim's home and collected a blanket, video surveillance from a nanny camera, and the Defendant's cellphone as evidence. He identified the blanket he collected from the home at trial, which was admitted into evidence.

The victim, eight years old at the time of trial, testified that she lived at home with Mother, Father, and three older brothers. She identified a photograph of herself, one of her brothers, and "Mr. Sean." She did not remember the day the photograph was taken. She did not remember if the person in the middle was "Mr. Sean." At some point on the day the photograph was taken, she played video games with Mr. Sean, and he asked her to get him water from the refrigerator in the garage. She obliged and returned to the room where they were playing video games. The victim was sitting on Mr. Sean's lap, and he did not have anything over his lap. The victim said, "I actually did not know until my dad came home[,] and he told me to go in the room."

Mother testified that she lived with Father, her two sons, and her daughter, the victim in this case. She said one of her sons, who was present on the day of the offense, was older than her daughter. On February 14, 2022, she went to work and left her son, the victim, and the Defendant at the home. She explained that the Defendant was a "good friend" of her two older children and that she had known him "for a very long time." She identified the Defendant in court. On the day of the offense, she received a call from her husband. During the phone call, she spoke with the Defendant. Mother testified that the Defendant said, "I molested [the victim]" and "I'm sorry."

On cross-examination, Mother explained that the Defendant had lived with them for about two weeks during COVID and visited their home "a lot" before that time. She agreed that the Defendant was "a very good friend of the family" and that the victim "really liked hanging with him and being with him." Asked if the victim was "very comfortable sitting on [Defendant's] lap," Mother said, "Yeah, I guess." She agreed that the victim would "play around" and engage in "general goofery" with her sons and the Defendant but denied that the victim would "lay" and "sit" on the Defendant.

Father testified that on February 14, 2022, the Defendant watched the children while he went to a doctor's appointment. After his doctor's appointment, he checked on the nanny camera and observed the Defendant picking up the victim and groping her. He immediately returned home. His son was in his room, and the Defendant and the victim were in his other son's room with the door shut. When he entered the room, the victim was

- 2 -

standing in front of the Defendant with the blanket wrapped around both of them. She was standing "right up against" the Defendant "in between his legs," which were spread apart. Father told the victim to leave the room and directed the Defendant to stand up. When the Defendant stood up, Father told him to remove the blanket. The Defendant took the blanket off and was naked from the waist down. Father said the Defendant's pants were not around him and his underwear was "completely off." Father observed the Defendant's genitals and said Defendant was not erect. He described the blanket previously admitted into evidence as the blanket the Defendant had used to cover himself. The Defendant told Father, "I'm sorry. I molested her." Father said Defendant looked "shocked" and "disgusted and like he was sorry when he did that and that he got caught."

Father said the nanny camera only records video footage and does not have sound. He identified six video excerpts from the nanny camera, approximately five minutes in total length. The videos were admitted into evidence and played for the jury. Father noted that the victim, the Defendant, and his son were in the videos.

During the first video, ending in 51, the victim and her brother are seated around the Defendant on a couch and appear to be watching television. The Defendant seems to be playing on a device. The brother is off-camera for some time. The victim appears to reach for the Defendant's device, and the Defendant raises his arm above his head and moves the device from her reach. The Defendant continues to hold the item out of the victim's reach until she is lying in his lap. Once she lies in his lap, the Defendant gives her the item, and he simultaneously pulls the victim's body to a straddle position over his body. The victim is straddled over the Defendant's body with her legs spread apart while she is playing on the device.

During the second video, ending in 54, the victim remains straddled over the Defendant's body with her buttocks atop the Defendant's groin while playing on a device. The Defendant's hands are in the back of the victim. The Defendant repeatedly pulls the victim back to position her buttocks atop his groin. His hands are on the victim's upper thigh area. The Defendant leans forward and talks to the victim, and his hands are now positioned in her inner thigh area. He leans back and pulls the victim over his groin, and his hands are around her waist. The brother returns to the video frame and leans into the Defendant. There appears to be a discussion, and the Defendant hands a device to the brother. The victim continues to be seated atop the Defendant.

During the third video, ending in 58, the victim remains seated atop the Defendant. He continues to pull her back atop his groin area. She continues to play on a device while watching television. The Defendant has another device in his hands. The Defendant pulls the victim back into his body and places his arms around her waist. He raises the victim's body and places her atop his groin area, and he leans into the victim's body in a hug fashion

- 3 -

and puts both of his arms between her legs with his hands close to the floor.  He repositions the victim over his groin and leans back into the victim with his arms around her, spreading her legs apart.  He repositions himself and the victim in the chair and begins to bounce his knees, which, in turn, has the victim's body bouncing atop of him for approximately eight seconds.  The Defendant repositions the victim over one of his legs and begins to rub the victim's upper thigh.

During the fourth video, ending in 00, the Defendant has the victim straddled over his leg and then repositions her atop his groin by putting her legs together.  The Defendant's hands can be seen underneath the victim's buttocks and near his groin.  The Defendant begins to bounce his knees quickly.  He then begins to rock back and forth and repositions the victim atop his groin while rubbing her upper thigh.  He rocks back and forth while pulling the victim into his body.  He places his hands underneath the victim's buttocks while her legs are together.  His head is on her shoulder each time he repositions her.  The victim closes her legs and positions her body with closed legs on one of the Defendant's legs.  Her brother comes back into the video frame.  The victim straddles one of the Defendant's legs, and the Defendant pats her legs.

During the fifth video, ending in 04, the victim is straddled atop the Defendant's groin with the Defendant's body around her such that he is cheek to cheek with the victim with his hand on her upper thigh.  He rubs her upper thigh.  He repositions the victim to be standing between his legs with his hand on her hip, apparently rocking the victim's body back and forth or side to side.  The victim moves to the side of the Defendant's body, and the Defendant pulls her back atop his groin.  She is seated on his stomach or chest area, with the Defendant's hands on her buttocks, repeatedly repositioning her.  They lay back in the chair.  The victim sits up, and the Defendant places her in a straddle position over his body, and the Defendant begins to bounce his knees quickly for approximately ten seconds. During the sixth video, ending in 06, the Defendant picks up the victim and takes her out of view from the camera.  His body and the brother's body are visible later in the video, but it is unclear what is happening.

Father told the Defendant he was going to call the Defendant's mother and the police.  He also tried to call his wife but was unable to reach her.  The Defendant called his mother, put her on speaker phone such that Father could hear her, and the Defendant told his mother that he molested the victim.  When Father eventually reached Mother on the phone, the Defendant also told Mother that he molested the victim.  Father denied threatening the Defendant.

On cross-examination, Father agreed that at a previous court hearing he characterized the Defendant's actions on the video from the nanny camera as "rubbing her inner thighs and everything and around the vagina[.]"  He maintained that the Defendant

was rubbing close to the victim's vaginal area. He agreed that he was upset upon entering the home. Although he could have hurt the Defendant, he did not. Instead, Father had the Defendant call his mother to tell her "in his own words" what he had done to the victim. Father denied being angry enough to hurt Defendant during his call to his mother.

**Defense Proof.** Amanda Hill, a forensic interviewer with Junior's House Child Advocacy Center, testified as an expert in child forensic interviews. She conducted the victim's forensic interview, which was video recorded. During the interview, the victim was aware of and understood the meaning of private parts. The victim did not indicate that the Defendant had touched her on a private part. However, when asked, "Has there ever been anyone that tried to show you their private parts?" the victim said the Defendant's name. Hill was asked if the victim could explain how "that happened with her father removing a blanket or something?" Hill replied that the victim "was not able to clarify after that."

On cross-examination, Hill agreed that it was not unusual for a child the victim's age to be unable to correlate time the same as adults. Hill also agreed that it was not unusual for a minor child to be unable to "tell what happened to them." She explained that "sometimes children . . . might not have the appropriate words on how to express or describe what happened to them." On redirect examination, Hill agreed that "most" six-year-olds could understand what is meant if asked, "[D]id a person touch you here."

The victim's nineteen-year-old brother met the Defendant through his brother, had known the Defendant for "about seven or eight years," and considered the Defendant "a really big brother." He testified that the Defendant "got along . . . . [l]ike, extremely well" with the victim and his younger brother. He said the victim and his younger brother considered the Defendant their "big brother." Prior to the allegations in this case, the Defendant would come to their home "almost every weekend." Older brother observed the victim sit on the Defendant's lap "a lot." He said, "Like, sometimes [the Defendant] wouldn't even let her on his lap because she just jumped on him constantly." He agreed that the victim did so "without invitation" from the Defendant. He said the victim engaged in this behavior in the presence of Mother and Father, and it was "no secret" she liked to "climb up" on the Defendant. He testified that the Defendant had a "nervous habit" of "bouncing his legs up and down a lot[,] especially when he's playing video games." On cross-examination, older brother testified that he never observed the Defendant refuse to allow the victim to get off of his lap. He agreed that he was not at home on the day of the offense.

The twenty-one-year-old Defendant testified that he was nineteen on the day of the offense. He met the victim's family when he was in the seventh grade. He described his relationship with the victim and the youngest of her brothers as "great." He "loved them"

and believed they "loved [him] back." He considered himself their fun big brother and was always engaged in horseplay with them. He said he would carry them around the house, "picking them up by [their] arms all the time." He said it was common for the victim to initiate being on his lap as shown in the nanny camera video recordings. A photograph showing the Defendant, the victim, and her youngest brother smiling with funny faces was admitted into evidence.

The Defendant explained that each video was in the living room. As to the video ending in 58, the Defendant used a pillow in court to demonstrate where the victim was positioned on his lap. He agreed at certain points in this video that the victim's buttocks were "basically sitting on [his] upper just towards [his] groin." He agreed that the victim's buttocks contacted his full groin area. The Defendant denied receiving any sexual enjoyment or gratification while the victim was seated in his lap or at any other time. He denied getting an erection while the victim was sitting in his lap. The video continued to play, and the Defendant agreed that the victim's buttocks were "kind of sunken down between [his] legs." The Defendant explained that he moved the victim "for her safety" and so she would not "fall through [his] legs . . . forward . . . or backward." He acknowledged, however, that she was on the sofa. He said the victim weighed about 60 or 70 pounds and that he moved her because, over time, his legs became tired, and it was uncomfortable. He said he was losing blood flow to his legs and was moving to get his blood flowing. As the video continued to play, he explained that he moved the victim for comfort. He described a moment where he was getting the game controller for the victim's young brother. He said he was holding the controller behind the victim "kind of in [his] lap" and "behind her." He said there were other points in the video where he was "fidgeting" with his hands behind the victim; however, he had the game controller and his phone in that area.

He said the victim also liked to sit on his lap because it was easier to help the victim if she had questions about the video game. He explained his "rocking back and forth" was because he had "back stiffness" from sitting in that position for quite a long time. He said the victim's legs were bouncing up and down because his legs were bouncing up and down. He tended "to just bounce [his] knees" and likened it to someone biting their fingernails.

For the video ending in 00, the Defendant explained that he pulled the victim's shirt down to avoid it "riding up." He again said he moved the victim around because she had been sitting on him for a while, and his leg was getting tired. He agreed that he put his hands on her thighs, but he explained it was for stability and not sexual arousal. He also denied that rocking back and forth was for sexual arousal. He said the victim's youngest brother was in the chair next to them in the same room during each of the videos.

- 6 -

For the video ending in 04, the Defendant discussed a pen or inhaler that he had been looking for and had found during the video. He can be seen pulling the victim back into him, and he explained that he did so because the victim asked him a question about a game, and he wanted to tell her what buttons to press on the controller.

During the last video, the Defendant explained that he picked up the victim and went to "the back room." He said he moved everything back there because it had a television with a smaller screen, which he preferred. He said after he had gotten the PlayStation in the back room, he "went to go wash clothes and [he] wrapped [himself] up in a blanket[.]" He said he changed clothes in the laundry room and removed his "pants around underwear." He wrapped himself up in a blanket, and "once he was covered," he told the children it was "okay to come in." The Defendant demonstrated to the jury how he was wrapped in the blanket previously admitted as an exhibit. The Defendant denied that he was wrapped in the blanket with the victim as described by Father.

The Defendant described Father's demeanor when he arrived home as "very upset and very fast." The Defendant agreed Father was "hot" and believed Father could have assaulted him. He agreed that Father came into the room, told the victim to leave, and told him to remove the blanket. He said he was embarrassed because he was naked from the waist down. He agreed that Father told him to call his mother. He explained, "In the beginning I was just – I didn't know what to say[,] and I had said that I had molested [the victim]." However, he agreed that he did not intend to convey to his mother that he had sexual contact with the victim "in a manner that brought [him] sexual gratification." He acknowledged that he "had done something inappropriate. I was naked with a child on my lap, I guess." He said he told his mother he molested the victim based on Father's reaction, not because he molested her. When the police arrived, the Defendant cooperated by providing access to his phone. His phone did not contain any photographs of the victim or any other minor children. The Defendant denied intentionally showing the victim his penis, and he explained she may have seen it when Father told her to leave the room because she was still in the doorway when he removed the blanket.

On cross-examination, the Defendant insisted there were six inches of space between the victim's buttocks and his groin in the video ending in 00 at marker 1:54, and he maintained the same amount of space throughout the rocking back-and-forth motion. Even though he was tired, the Defendant did not tell the victim to get off his lap because "[t]hat's where she wanted to be." He agreed that when the victim got off of his lap, he pulled her back to sit in his lap. He did so without asking the victim. The Defendant said that he and the victim alternated playing video games when he moved to the back room. He said the victim told him she wanted to move to the back room to play video games on the smaller television. The Defendant denied closing the door to the back room. The Defendant said he put his clothes in the laundry because he had been there for over two

weeks due to COVID. He had not planned on being there for that long, and those clothes were all he had to wear. He said he put only his pants and underwear in the laundry. He confirmed that he started the laundry with these items inside the washer. Based on an image from the nanny camera video, the Defendant confirmed the pants he wore that day had a red flower design or "X" on his left knee. He did not launder his shirt because he did not like his upper body to be exposed. The State asked the Defendant to demonstrate for the jury how much the blanket covered his body, and the Defendant agreed that it covered his entire body, including his upper body.

Regarding his interaction with Father, the Defendant said he initially told Father he molested the victim because he did not think to ask Father why he was upset. He said, "it was more me trying to figure out what I had done and with the way that [Father] was feeling . . . it conveyed to me that . . . I had done something so bad as to molesting [the victim] and so that's what I told my mother." He said there were two to three minutes between the phone calls to his mother and the victim's mother. He remained afraid of Father during the second phone call, so much so that he also told Mother that he molested the victim. He said he tried to calm down Father and that he was forced to say that he molested the victim out of fear Father would hurt him. He said Father forced him into a corner while on the phone with his mother. He agreed that Father forced him to talk to his mother, but Father did not force him to say, "I molested [the victim]" to his mother or the victim's mother. He apologized to his mother because, at that time, he believed he had done "something bad."

Officer Robert Gurley of the Lewisburg Police Department was called to testify as a rebuttal witness for the State. He responded to the victim's home on the day of the offense. He remained outside with the Defendant while the other officers were inside. His body-worn camera recorded their interaction and was admitted as evidence at trial.[1] The video, played for the jury, showed the Defendant wearing a short-sleeved shirt and blue sweatpants with "some flowers or multicolored paint" on his left leg.

In surrebuttal, the Defendant was recalled and testified that he observed the video played during Officer Gurley's testimony. He explained that in better lighting, he recognized the pants he was wearing in the nanny camera video image, which had a "Tom and Jerry" insignia on the left knee. He said the pants he wore in the video with Officer Gurley were not the same as in the nanny camera video image. He said the pants with the Tom and Jerry insignia were still in the washer, as he previously testified. While the pants were similar, the Defendant explained that the victim's older brother had purchased each of them the same pair of pants. After Father confronted him, the Defendant put on the

---

[1] Although the CD of the body-cam footage was included in the record on appeal, this Court was unable to view the footage. Our inability to do so did not impact our decision in this case.

oldest brother's pants. Older brother was also recalled and testified that in February 2022, he had a "very similar pair of pants" to the Defendant. He said they were "Tom and Jerry" pants, and his brother had purchased a pair for the Defendant and the victim's oldest brother. He said they were dark green sweatpants.

Based on the above proof, the jury convicted the Defendant as charged of aggravated sexual battery, and he was later sentenced to ten years in confinement. Following an unsuccessful motion for a new trial, the Defendant filed a timely notice of appeal. This case is now properly before this Court for review.

## ANALYSIS

The Defendant concedes that he touched the minor victim in this case. His sole challenge on appeal, as it was at the trial, is whether touching the victim's thighs and buttock area as she sat on his lap playing video games can be construed as for the purpose of sexual arousal or gratification. He insists the touching was "simply to move the child around in a non-sexual manner," and his statement, "I molested [the victim]," was obtained under duress. As such, the Defendant contends the State failed to prove the essential element of touching for the purpose of sexual gratification. In response, the State contends the Defendant is not entitled to relief because there was sufficient evidence for a rational jury to find that the Defendant touched the victim for the purpose of sexual gratification. We agree with the State.

We apply the following well established framework to challenges to the sufficiency of the evidence in support of a conviction. "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review

for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). Finally, this court has stated that in cases where the sufficiency of the evidence of the defendant's intent is challenged, "intent is almost always proven circumstantially." State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973)).

The Defendant was convicted of aggravated sexual battery. As charged in this case, the State was required to prove the Defendant engaged in "unlawful sexual contact with a victim . . . [where] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Here, the Defendant challenges only whether his contact with the victim was unlawful as defined by statute. "Sexual contact" is statutorily defined to include:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Id. § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Id. § 39-13-501(2). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(21).

Viewing the evidence in the light most favorable to the State, the Defendant was watching the victim and her youngest brother while their parents were at work and a doctor's appointment. Direct evidence was presented at trial through the videos from a nanny camera recording taken from the living room of the victim's home. The videos show the victim straddled over the Defendant's groin area, facing a screen while playing on a device. The Defendant repeatedly pulls the victim into his groin area while she is sitting

on his lap, positioning her buttocks atop of his groin. Throughout the videos, the Defendant is shown pulling the victim's legs apart, rocking back and forth and up and down, and rubbing the victim's upper thighs and buttocks. The Defendant agreed that the video showed the victim's buttocks were "basically sitting on [his] upper just towards [his] groin" and that the victim's buttocks contacted his full groin area. At times, the Defendant bounces his legs such that the victim's buttocks are bouncing atop his groin area.

When Father observed the behavior on video, he rushed home. By the time Father arrived home, the Defendant had picked up the victim and taken her to the other son's room or the back room. Father observed his younger son was in his room, and the Defendant and the victim were in his other son's room alone with the door shut. When Father entered the room, the victim was standing in front of the Defendant with a blanket wrapped around both of them. The victim was standing "right up against" the Defendant "in between his legs," which were spread apart. Father told the victim to leave the room and directed the Defendant to stand up. When the Defendant stood up, Father told him to take the blanket off. The Defendant removed the blanket and was naked from the waist down. Father said the Defendant's pants were not around him, and his underwear was "completely off." The Defendant told Father, "I'm sorry. I molested her." Father said Defendant looked "shocked" and "disgusted and like he was sorry when he did that and that he got caught." The Defendant called his mother and the victim's mother and told each of them that he had molested the victim and that he was sorry.

The Defendant's state of dress, the location and timing of the contact, the manner and duration of physical contact, and his explicit statement to three people that "I molested [the victim]" and "I'm sorry" are each factors from which a jury could reasonably infer that the Defendant's touching was for the purpose of sexual arousal or gratification. We need not address each of the arguments raised by the Defendant on appeal because they were presented to and rejected by the jury in this case. State v. McKnight, 900 S.W.2d 36, 50 (Tenn. Crim. App. 1994), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013) ("Although the defendant claimed that [touching the victim's bottom was] a gesture of approval and friendship, it was the jury's prerogative to reject that theory."). Because a rational jury could determine beyond a reasonable doubt that the Defendant touched the victim for the purpose of sexual arousal or gratification, the evidence is sufficient to support the Defendant's aggravated sexual battery conviction. He is not entitled to relief.

## CONCLUSION

- 11 -

Based on the above authority and analysis, the judgment of the circuit court is affirmed.

s/ _____Camille_____R. McMullen_____

CAMILLE R. MCMULLEN, PRESIDING JUDGE